IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF TWO CELL PHONES (SAMSUNG GALAXY AND iPHONE MODEL A1522) IN THE CUSTODY OF THE ST. ALBANS POLICE DEPARTMENT | Case No. 2:20-mj-49 |

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2020 APR 16 AM 11:55
CLERK
BY_____
DEPUTY CLERK

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Timothy Hoffmann, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit under F.R.C.P. 41(e)(2)(B) in support of an application for a search warrant for electronically-stored information, further described in Attachment B, from two cellular devices: a Samsung Galaxy (DEVICE 1) and an Apple iPhone Model A1522 (DEVICE 2). DEVICE 1 and DEVICE 2 were seized on October 24, 2019, during an investigation involving Timothy Dudley and Austrain Peguese, and are described with particularity in Attachment A. DEVICE 1 and DEVICE 2 are currently in the custody of the St. Albans Police Department (SAPD) in Franklin County, Vermont.

2. I am a Special Agent (SA) with the Drug Enforcement Administration (DEA).

3. I am assigned to the DEA's Burlington Resident Office (BRO). I was hired as a SA with DEA in 2012, and I completed my training in 2013. In connection with my duties and responsibilities as a SA, I have received extensive training in the field of narcotics investigation and enforcement. I have received training, both formal and informal, in the investigation of violations of controlled substance offenses, including attending several schools regarding general narcotics investigation. I completed the DEA Basic Agent Training Academy, located in Quantico,

1

Virginia. I have also received specialized training related to the investigation of money laundering and other financial crimes related to drug trafficking. I have also participated in investigations relating specifically to the possession and distribution of heroin and cocaine base, the drugs involved in this investigation and discussed herein. I have also participated in various aspects of investigatory work, including but not limited to undercover surveillance and undercover narcotics purchases, and I have participated in a number of narcotics-related arrests and the execution of many narcotics-related search warrants. I have written affidavits in support of search and arrest warrants, and I frequently utilize the services of informants and other confidential sources of information. I also have training and experience in obtaining electronic evidence through search warrants to further narcotics investigation and enforcement.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the electronically-stored information, further described in Attachment B, contained with DEVICE 1 and DEVICE 2, further described in Attachment A, constitutes evidence and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 843, and 846, distribution of, use of communication facility in furtherance of, and conspiracy to distribute controlled substances.

## PROBABLE CAUSE

6. On or about October 16, 2019, the SAPD started an investigation into the sale of crack cocaine by Timothy Dudley. The investigation utilized a cooperating individual (CI), who

advised SAPD that he/she has purchased cocaine base from Dudley in the past. The CI voluntarily worked with the SAPD in exchange for monetary compensation. The CI has two prior criminal convictions for DUI.

7.     The CI informed SAPD that Dudley was selling cocaine base from his residence of 53 High Street, #6, St. Albans, VT for $100 a gram. The CI provided SAPD with Dudley's Facebook profile picture. SAPD showed the CI a mugshot photograph of Dudley, which the CI positively identified as Dudley.

8.     On October 16, 2019, SAPD met with the CI. The CI advised that he/she had communicated with Dudley via Facebook messages that day. SAPD Cpl. Trevor Sargent photographed the conversation between the CI and Dudley. In the messages, the CI asks Dudley to purchase 1 gram of cocaine base. In response, Dudley tells the CI to "come over to my place," and offers to sell the CI more cocaine base. Two photographs of those Facebook messages follow, which show the current profile picture and username ("Tj Dudley") for the Target User ID:



9. The CI was instructed to travel a specific route to 53 High Street #6. Cpl. Sargent instructed the CI to enter the residence and purchase crack cocaine from Dudley. Cpl. Sargent provided the CI with $100.0 in recorded SAPD Funds for the purchase of a gram of crack cocaine.

10. At 09:51 hours, Cpl. Sargent conducted a search of the CI and no contraband was found. At 09:52 hours, Cpl. Cote conducted a search of the CI's vehicle and no contraband was found. At 09:56 hours, the CI traveled the desired route to Dudley's residence, which is at 53 High Street #6. Cpl. Sargent monitored the CI as he/she traveled to the residence. At 09:59 hours, I observed the CI enter 53 High Street #6 at the front door. At 10:10 hours, Cpl. Sargent observed the CI exit 53 High Street #6 drive back to the desired meeting location. At 10:12 hours, Cpl. Sargent met with the CI at the desired meeting location. At 10:13 hours, the CI turned over to Cpl. Sargent a chunky white substance, which, through his training and

4

experience, he immediately recognized as crack cocaine. At 10:13 hours, Cpl. Sargent conducted a search of the CI and at 10: 16 hours, Cpl. Cote searched the CI's Vehicle and no contraband was found.

11.     A sworn taped statement was obtained from the CI after the deal/transaction. During the sworn recorded statement, the CI told Cpl. Sargent that he/she arranged the purchase of crack cocaine with Dudley that day and gave Dudley $100.00 in SAPD recorded funds for the purchase of crack cocaine. The CI stated that he/she was searched prior to and after the deal transaction and no contraband was found. The CI stated that he/she went directly to Dudley's residence where he/she purchased crack cocaine. The CI said that Dudley had powdered cocaine and cooked it down to crack cocaine and gave it to him/her without packaging.

12.     Cpl. Sargent identified the suspected cocaine base with the use of a Sirchie Cocaine ID Swipe. The test results showed that the chunky white substance was presumptive positive for the presence of cocaine. The suspected cocaine base was sent to the Vermont Forensic Laboratory for further analysis. The suspected cocaine base was weighed with its packaging and yielded an approximate weight of .3 grams.

13.     On October 22, 2019, at 14:18 hours, Cpl. Sargent met with the CI at a predetermined meeting location. The CI told Cpl. Sargent that he/she had communicated with Dudley that day via Facebook. In the message, Dudley told the the CI to "stop by." Cpl. Sargent photographed the message between Dudley and the CI. The photograph follows, which again shows the current profile picture and username ("Tj Dudley") for the Target User ID and also appears to show a "missed call" from the CI to Dudley:



14.     The CI was instructed to travel a specific route to 53 High Street #6. Cpl. Sargent instructed the CI to enter Dudley's residence and purchase crack cocaine from Dudley. Cpl. Sargent provided the CI with $100.0 in recorded SAPD Funds for the purchase of a gram of crack cocaine. The CI was also outfitted with an audio recording device.

15.     At 14:19 hours, Cpl. Sargent conducted a search of the CI and no contraband was found. At 14:19 hours, Cpl. Cote conducted a search of the CI's vehicle and no contraband was found. At 14:22 hours, the CI traveled the instructed route to Dudley's residence, which is at 53 High Street #6. Cpl. Sargent monitored the CI as he/she traveled to the residence. At 14:26 hours, Cpl. Sargent observed the CI enter 53 High Street #6 at the front door. At 14:30 hours, Cpl. Sargent observed the CI exit 53 High Street #6. Detective Sergeant McCarty monitored the CI as he/she drove back to the instructed meeting location. At 14:35 hours, Cpl. Sargent met with the CI at the instructed meeting location. At 14:36 hours, the CI turned over to Cpl. Sargent, two

clear plastic corner bag packages containing a chunky white substance, which through Cpl. Sargent's training and experience, he immediately recognized as crack cocaine. At 14:36 hours, Cpl. Sargent conducted a search of the CI and at 14:37 hours, Cpl Cote searched the CI's vehicle and no contraband was found.

16.  A sworn audio recorded statement was obtained from the CI after the deal/transaction. During the sworn audio statement, the CI told Cpl. Sargent that he/she arranged the purchase of crack cocaine with Dudley. The CI stated that he/she was searched prior to and after the deal transaction and no contraband was found.  The CI stated that he/she went directly to Dudley's residence where he/she purchased crack cocaine. The CI said that there was an unknown male at 53 High Street #6 when the CI purchased the suspected crack cocaine from Dudley. During the controlled purchase, the CI stated that he/she saw that Dudley had approximately "20 bags" of suspected crack cocaine and a spoon containing a substance that the CI believed to be heroin. The CI stated that the suspected crack cocaine that he/she purchased came from Dudley's pocket.

17.  Cpl. Sargent identified the suspected cocaine base with the use of a Sirchie Cocaine ID Swipe. The test results showed that the chunky white substance was presumptive positive for the presence of cocaine. The suspected cocaine base was sent to the Vermont Forensic Laboratory for further analysis. The suspected cocaine base was weighed with its packaging and yielded an approximate weight of .7 grams.

18.  Cpl. Sargent reviewed the recorded conversation between the CI and Dudley, which took place at 53 High Street #6.  Cpl. Sargent reported that, on the recording, among other items, Dudley can be heard arguing with an unidentified male, stating that he woke up with "4 pieces out of 10," as well as asking the CI to take a hit and if the CI was "working for the cops."

19.     Based on these two controlled purchases, Cpl. Sargent obtained a state search warrant for Dudley's residence on October 24, 2019. Law enforcement executed the search warrant the same day at approximately 8:52 p.m.

20.     Prior to assisting in the execution of the search warrant, Cpl. Schwartz observed a white male, later identified as Dudley, looking out from the window of the north bedroom of 53 High Street #6.

21.     During the execution of the search warrant, Officer Allison, who was tasked with perimeter security, saw items thrown from a second story window on the south side of 53 High Street #6. Officer Allison was almost struck by a bag that he described as a "diaper bag" that hit the ground beside him. Seconds later, Officer Allison observed another item that he described as a tightly wrapped plastic package thrown from the window; it hit tree limbs on its way to the ground.

22.     During the execution of the search warrant, only two individuals were located inside the residence of 53 High Street #6: Dudley in the north bedroom upstairs (the same bedroom from which he was observed looking out from the window) and Peguese in the south bedroom upstairs (the bedroom from which the items were thrown from the window). Peguese was identified by Massachusetts photo identification card that was found in his pocket along with U.S. Currency (approximately $790) and two (2) Buprenorphine 8-milligram films.

23.     DEVICE 1 was seized from Dudley's pocket. DEVICE 2, found on the dresser in the south bedroom, was seized, and is believed to belong to Peguese. According to his affidavit, SAPD Sergeant Michael Malinowski unlocked DEVICE 2 and navigated through the settings to prevent the phone from locking.

24. SAPD Sergeant Michael Malinowski deployed his K9 Ringo around the exterior of the residence. K9 Ringo alerted on the bag that Officer Allison referred to as a "diaper bag." A search of the bag revealed that it contained the following: approximately 620 bags of suspected heroin and approximately 101 grams of suspected cocaine. The plastic-wrapped object that Officer Allison saw thrown from the window was also located by K9 Ringo, and it was determined to be approximately 16 grams of suspected cocaine base.

25. Sergeant Malinowski conducted a field test of the largest package that contained the suspected cocaine, resulting in a presumptive positive for the presence of cocaine. No field-testing was conducted on the suspected heroin. I have personally observed photographs of the seized suspected controlled substances. Based on my training and experience, the 101 grams of suspected cocaine has the appearance of cocaine, the 16 grams of suspected cocaine base has the appearance of cocaine base, and the suspected heroin was packaged in the manner consistent with how heroin/fentanyl is packaged for distribution in this area of Vermont.

26. During the execution of the search warrant, SAPD arrested Dudley for the sale of cocaine (two counts) based on the above-described events. Dudley was transported to SAPD for processing and an interview. Prior to the interview, Cpl. Keith Cote read Dudley his *Miranda* rights, and Dudley waived his rights.[1] Among other things, Dudley told Cpl. Cote that Peguese used the alias "D," he has known "D" for approximately a month, and

---

[1] Dudley admitted to using heroin and cocaine base, and his criminal history includes convictions for False Information to Law Enforcement, Possession of Narcotics/Stimulant/Depressant, Careless and Negligent Operation, and Eluding Law Enforcement Officer.

9

"D" had been at 53 High Street #6 for approximately two days for the purpose of selling illegal drugs. Dudley said that Peguese paid him a bundle of heroin (10 bags or doses) and one gram of crack cocaine a day to stay at his residence.

27. According to Cpl. Keith Cote's affidavit, Dudley further advised that he has known Peguese for approximately one month and met him through a friend. Dudley advised that he owed Peguese money, which was a drug debt, so Peguese brought drugs to Dudley's house to sell. Dudley advised that he owed Peguese hundreds of dollars. When asked if there was anybody else in the house when the search warranted was executed, Dudley responded in the negative. Dudley advised that he was in the upstairs apartment on the north end of the apartment and Peguese was in the upstairs apartment on the south end of the apartment. Dudley further advised that he was selling heroin and crack cocaine for Peguese to make up the drug debt and that Peguese had brought up "a bunch" of sleeves[2] of heroin and crack cocaine when Peguese arrived two days prior. Dudley added that when a customer showed up, Peguese would give the drugs to him to provide to the customer, then he (Dudley) would bring the money back to Peguese. Dudley further stated that he has been dealing drugs out of his apartment for a couple of months.

28. On January 30, 2020, a federal grand jury sitting in Burlington, Vermont returned a four-count indictment (20-CR-00019, ECF No. 3) charging Dudley and Peguese with drug-related offenses. In particular, Count One charged Dudley and Peguese with, on or about October 24, 2019, knowingly and intentionally possessing with intent to distribute heroin, a Schedule I controlled substance, cocaine, a Schedule II controlled substance, and

---

[2] In my training and experience, a "sleeve" a heroin typically contains 100 bags or single doses of heroin.

10

cocaine base, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2. Count Two charged Dudley with, in October 2019, managing and controlling a place, namely 53 High Street, #6, St. Albans, Vermont, as owner and lessee and occupant, and knowingly and intentionally making that place available for use for the purpose of unlawfully distributing controlled substances, in violation of 21 U.S.C. § 856(a)(2). Counts Three and Four charged Dudley with knowingly and intentionally distributing cocaine base, a Schedule II controlled substance, on or about October 16, 2019 (Count Three) and October 22, 2019 (Count Four) in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C).

29. On February 6, 2020, Dudley and Peguese were arraigned on the aforementioned indictment before the Honorable John M. Conroy, United States Magistrate Judge for the U.S. District Court for the District of Vermont.

**KNOWLEDGE, TRAINING, EXPERIENCE RELATED TO DRUG INVESTIGATIONS**

30. Based upon my training and experience, I also know the following information related to controlled substance violations:

   a. Persons who participate in the distribution of controlled substances frequently use cellular telephones, among other communication devices, to coordinate their unlawful activities and to maintain contact with suppliers and consumers of illegal drugs.

   b. I know that information stored in the memories of these communications devices constitutes evidence of drug trafficking and/or the illegal movement of currency. Among other things, the evidence may contain the telephone numbers assigned to the communication devices, messages received by or sent from the devices, identification numbers and other information contained in their electronic

memories, and the records of telephone numbers to which calls were placed and from which calls were received.

c. With their cellular phones, drug traffickers often take photographs of other members of their organizations, assets obtained from profits of drug sales, locations associated with their illegal activity, and other useful evidence.

d. I also know that persons engaged in such illegal activity will often deny ownership of these phones in an attempt to thwart law enforcement's efforts to connect them to more serious crimes, possible co-conspirators, and/or their sources of supply.

e. Data contained in a cell phone may reveal the physical location of the cell phone at various times. For example, if a cellular phone has Global Positioning System ("GPS") capabilities (which many do), additional information regarding locations of the phone, while it follows GPS directions, may be recovered from the device.

## TECHNICAL TERMS

31. Based on my training and experience, I know the following technical information about mobile devices:

a. Smartphones/cell phones are electronic devices (hereafter "devices") that contain a logic processing unit, an input/output capability, memory, and a radio antenna that permits the device to place and receive telephone calls and send and receive text or other data messages via the cellular network. These devices contain memory in several forms and locations. The most common form of memory is solid-state (as opposed to a hard drive, which is a spinning disc). Solid-state memory typically consists of a dense array of diodes that can hold tens of

12

gigabytes of information. Most solid-state memory on a smartphone device is considered "non-volatile," meaning that data can remain in storage even when the device is powered-down by the user. By contrast, "volatile" memory is a short-term form of memory that exists only when the device is turned on. These devices often contain memory in other locations, including removable SD cards, SIM cards, video cards, logic boards, and other microchips that maintain data in memory to perform their specific function within the phone. The scope of this warrant application is a search of all volatile and non-volatile memory contained within the devices. Allowing a search of the devices described in Attachment A may reveal evidence of communication between the device's user and others relevant to this investigation.

b. Modern smartphone devices, including the devices described in Attachment A, are capable of tracking and recording the device location data. For example, Apple iPhone devices utilize a feature called *Location Services* to track the device's location. *Location Services* uses GPS, Bluetooth, and crowd-sourced Wi-Fi hotspots and cell tower locations to determine the device's approximate location. *Location Services* allows Apple and third-party apps and websites to gather and use information based on the current location of the iPhone to provide a variety of location-based services. For example, an app might use the device location data and location search query to help the user find nearby coffee shops or theaters, or the device may set its time zone automatically based on the current location. If a user has enabled *Location Services*, services such as, "Traffic," which periodically sends the iPhone's GPS location and travel speed to Apple,

"Popular Near Me," which periodically sends locations of where, and when the device has purchased or used apps to Apple, "Significant Locations," which enables the iPhone to keep track of places the device has recently been, as well as how often and when the device visited them, in order to learn places that are significant to the device's user, and other location-based features will be logged and saved by the iPhone. Similarly, Android devices, such as one of the devices described in Attachment A, are capable of tracking and recording device locations, although Android and Google, LLC have different terms for this technology. Allowing a search of the device(s) described in Attachment A may reveal the date, time and location of the device at any particular time relevant to this investigation.

c. In addition, many apps utilized by smartphones track location data. For example, when a photograph is taken with a smartphone device, the location of the device along with the date and time the photograph was taken is often stored in the metadata of the digital photograph file. Allowing a search of the devices described in Attachment A may reveal the date, time, and location the device was used when a particular app was utilized.

d. Modern smartphone devices have widely varying memory capacities, ranging from less than one gigabyte of total memory to tens of gigabytes. To put this in perspective, 1 gigabyte of data is approximately 220,000 printed pages of text. The average smartphone is equipped with an average of 8 gigabytes of internal storage capacity and regularly up to a capacity of 256 gigabytes of internal storage capacity. Many smartphone models are also designed to accommodate a

second data storage location. A user may elect to install any number of memory cards that can increase the capacity of the smartphone device beyond 256 gigabytes of storage capacity. Often times these secondary data storage memory cards are supplied by the manufacturer at the time the device is purchased. To place this into perspective, this storage capacity is equivalent or exceeds the internal storage capacity of many laptop computers.

e. When smartphone users access, create, or modify files or data, the device memorializes that event in memory in some form. This memorialization of user activity ranges from the highly intuitive (an email drafted by the user is saved in the "drafts" folder of an email application) to that which only an expert might appreciate (the mere act of using the device can cause its operating system to reallocate files to new locations within memory). Files or data which have been created, accessed, downloaded, or saved by a user may be located by a trained examiner in predictable locations within a device. In some instances, files flagged for deletion by a user or otherwise "discarded" may still be retrieved by a trained forensic examiner. Given the sheer volume of available memory, it is quite likely that a file may still exist months or years after its user last accessed it.

f. Files that have been accessed or downloaded via the Internet onto a device are typically automatically downloaded into a temporary Internet directory or "cache." The web browser often maintains a fixed amount of non-volatile memory devoted to these files, and the files are overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Internet browser cache and temporary files may contain data ranging from images

to the content of websites visited. Thus, the data/files gleaned from browser cache and temporary files may be as diverse as the user(s) internet usage and will tend to reflect the user(s)' internet usage.

g. Although there are several popular operating systems in use on today's smartphone devices (for example: Apple iOS, Android, and Windows), and each operating system has several versions, it is often the case that such devices maintain files that memorialize their user's patterns of life, to include the contents of locally-stored and web-accessed emails, the contents of web-based social networking communication, SMS/MMS "text" messages, call logs, contact lists, information retained by "apps" utilized by the user, and local (non-web-based) content created, modified, or saved by the user. A trained forensic computer examiner may employ a variety of methods to locate such files and data. Allowing a search of the device described in Attachment A may reveal the content of communication between the device user and others relevant to this investigation.

h. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

32. Based on my training, experience, and research, I know that DEVICE 1 and DEVICE 2 have capabilities that allow them to serve as a smart phone, digital camera, and GPS navigation device, and that these devices can access the internet, among other capabilities. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

33. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

34. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how DEVICE 1 and DEVICE 2 were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on DEVICE 1 and DEVICE 2 because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer constitute evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

35. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

36. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

37. I respectfully submit that this affidavit supports probable cause for a search warrant authorizing the examination of DEVICE 1 and DEVICE 2 described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
Special Agent Timothy Hoffmann
Burlington Vermont Resident Office
Drug Enforcement Administration

Subscribed and sworn to before me on ___April 14, 2020___, 2020

_____
THE HONORABLE JOHN M. CONROY
UNITED STATES MAGISTRATE JUDGE

19